**Frank Bloksberg, SBN 150809**
**578 Sutton Way, # 377**
**Grass Valley, CA 95945-5390**
**Tel: (530) 478-0170**
**email: frank@bloksberglaw.com**

**Attorney for Plaintiff**
**Kevin Thompson**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Kevin Thompson** | ) CASE NO: |
| Plaintiff, | ) **COMPLAINT** |
| vs. | ) **1. Federal Employers' Liability Act (Negligence)** |
| **National Railroad Passenger Corporation (dba Amtrak), and Does 1 through 10, inclusive.** | ) **2. Federal Employers' Liability Act (Strict Liability - Federal Safety Appliance Act)** |
| Defendants. | ) **DEMAND FOR JURY TRIAL** |

Plaintiff KEVIN THOMPSON complains and alleges as follows:

**I.**

**THE INCIDENT.**

**Mr. Thompson was Injured While Working as a**

**Passenger Conductor for Defendant Amtrak.**

1. On January 20, 2020, Mr. Thompson had been working for the National Railroad Passenger Corporation (hereinafter, "Defendant Amtrak") just shy of 30 years.

2. Mr. Thompson worked out of Defendant Amtrak's Reno crew base, which encompasses portions of Northern California and Northern Nevada. On Sunday, January 19, 2020, Defendant Amtrak assigned Mr. Thompson to train number 6 on the Reno to Winnemucca run.

3. At the time, Defendant Amtrak was well aware that long haul consists, such as the California Zephyr, required a Passenger Conductor and an Assistant Passenger Conductor:

"For passenger trains consisting of two to six revenue passenger cars . . . the minimum crew will be a Passenger Conductor and one Assistant Passenger Conductor.[1]"

4. Nonetheless, Defendant Amtrak decided to short-staff train number 6 and sent Mr. Thompson without an Assistant Conductor. This type of short-staffing is known at Defendant Amtrak as "Conductor Only."

5. On Monday, January 20, 2020, Defendant Amtrak assigned Mr. Thompson to the Reno return run, on train No. 5. Defendant Amtrak had again short-staffed the train. By twice going cheap and ignoring the CBA's safety requirement of an Assistant Conductor, Defendant Amtrak unnecessarily endangered Mr. Thompson.

6. Every time Defendant Amtrak assigned Mr. Thompson to a train Conductor Only, he objected to supervisory personnel. He would remind them that both safety and the Collective Bargaining Agreement (hereinafter, the "CBA") required an Assistant Conductor. The supervisory personnel always overruled his objection and ordered Mr. Thompson to work the train. Mr. Thompson is informed and believes, and thereon alleges, that had he refused to work the trains, Defendant Amtrak would have removed him from service, cited him for insubordination and terminated his employment.

7. On the return trip to Reno, Mr. Thompson went to the rear car of the train to speak with

---

[1] Collective Bargaining Agreement Between the National Railroad Passenger Corporation (Defendant Amtrak) and Passenger Conductors and Assistant Passenger Conductors, dated October 27, 1999, Rule 11b., P. 9.

- 2 -

COMPLAINT

1  the train attendant about Reno boarding plans. He heard air blowing and knocking at the rear of the
2  car. Mr. Thompson knew that the knocking indicated that something was dragging under the train.
3      8.    He contacted the Engineer and asked about air pressure status. The Engineer confirmed
4  that air pressure was sufficient. Mr. Thompson ordered the train stopped so that he could inspect the
5  rear of the train.
6      9.    At approximately 9:00 am, the train stopped at the Colado siding - Nevada Sub, near
7  Lovelock, Nevada. Mr. Thompson deboarded the train and investigated the situation. He saw that the
8  train had struck a shopping cart.
9      10.    As Mr. Thompson approached the rear end of the car, he heard air leaking. He saw wire
10 debris hanging from the end of the train (Car #34047). He saw that the coupler was misaligned and
11 that the knuckle was open.
12     11.    Mr. Thompson confirmed three-point protection from the Engineer. He then removed the
13 wire from the main reservoir/brake pipe hose assemblies at the end of the train.
14     12.    Railroad safety rules, and federal law, require that the coupler be properly aligned. When
15 it is misaligned, the Conductor must realign it. This is a necessarily manual process. Mr. Thompson
16 had performed this routine activity countless times throughout his railroad career.
17     13.    At no time during his career did Defendant Amtrak provide Mr. Thompson any training
18 regarding how to properly align a coupler. Nor did Defendant Amtrak provide any tools to help
19 move or repair an improperly aligned coupler.
20     14.    Mr. Thompson attempted to realign the coupler. Mr. Thompson knew from decades of
21 experience that he could fairly easily move a correctly maintained coupler by pushing on the coupler
22 with a braced, overhand pushing movement. He could not move the coupler this way.
23     15.    Since Defendant Amtrak failed to provide any equipment for moving an improperly
24 functioning coupler, Mr. Thompson knew he had to move it without any mechanical aid. Since
25 Defendant Amtrak had violated Rule 11 of the Collective Bargaining Agreement by short-staffing

the train, Mr. Thompson knew he had to move the coupler without any help at all.

16. Mr. Thompson switched to a braced, underhand lift-and-push movement to align the coupler.

17. As he attempted to move the coupler to its correct, centered position, Mr. Thompson encountered resistance that should not have occurred and that he did not expect. He suddenly felt a pain in his right groin area. At that moment, he did not know how seriously injured he was. Fortunately, momentum carried the coupler to almost the correctly centered position.

18. Despite being in extreme pain, Mr. Thompson completed realigning the coupler by ensuring that it was properly centered. When he attempted to close the knuckle, he could not do so. Mr. Thompson's injury was not the reason he could not close it; the knuckle was defective in some way. Mr. Thompson replaced the air gasket between the brake pipe and the back-up hose that had been damaged by the shopping cart wire. Though he now recognized that he was seriously injured, and strongly suspecting that he had a hernia, Mr. Thompson completed his assignment.

19. When the train arrived in Reno, Mr. Thompson discovered that no Supervisor was there. Mr. Thompson telephoned his direct Supervisor, Road Foreman of Engines Kevin Reames. When Mr. Reames answered the phone, Mr. Thompson told him that he was injured on the job. Mr. Reames told Mr. Thompson that he was at home and offered to come to work to take Mr. Thompson to the hospital.

20. Mr. Thompson declined Mr. Reames' offer. He did not want to wait around in pain for Mr. Reames to arrive at the Reno station. Mr. Thompson wanted to go home and see his own doctor. When Mr. Thompson arrived home, he called his doctor's office and learned it was closed for Martin Luther King Day. He then went to the urgent care facility Yuba Docs.

21. At Yuba Docs, they informed Mr. Thompson of what he had already surmised: Mr. Thompson had a hernia and would most likely need surgery.

22. Defendant Amtrak provided Mr. Thompson no training or equipment for encountering

this type of faulty and improperly maintained equipment. Defendant Amtrak failed to provide proper staffing so that Mr. Thompson would have had the necessary assistance in performing his duties, including realigning couplers. Defendant Amtrak's failure to properly inspect, maintain and repair its equipment and adequately staff assignments needlessly endangered Mr. Thompson and led to his injury.

## II.

## Mr. Thompson's Normal: The Life He Built.

23. Prior to his injury, Mr. Thompson was extremely active. In addition to being an Amtrak Passenger Conductor for approximately 30 years, Mr. Thompson thrived in his outdoor, do-it-yourself lifestyle. Mr. Thompson lives in a rural area where you do things for yourself, pay a fortune to have someone else do them, or simply defer taking care of your property. In these days of extreme fire risk where he lives, the latter is not a choice Mr. Thompson would ever willingly make.

24. Prior to the incident, Mr. Thompson greatly enjoyed playing guitar, hiking and going on backpacking trips in the Sierra Nevada Mountains. Since the incident, he has either been physically or emotionally unable to do any of these activities.

25. Mr. Thompson prided himself on being able to accomplish most anything on his own, whether that is building fences, felling and bucking trees, splitting wood, maintaining his own vehicles, painting his house, sweeping the chimney, replacing doors, replacing siding, helping his children move (both physically and financially) or any of a myriad of other projects and tasks.

26. Not only did Mr. Thompson pride himself on consistently getting these things done, he greatly enjoyed them. These are the things that filled Mr. Thompson's life with joy. Due to Defendant Amtrak's negligence, leading to Mr. Thompson's injury, these things are gone from his life for the foreseeable future, if not forever.

## III.

## Trying to Heal and the New Normal:

## Defendant Amtrak Turned Mr. Thompson's Life Upside Down.

27. The incident not only caused Mr. Thompson to suffer a hernia which required two surgeries, but it exacerbated previous injuries to his back and leg that he suffered while working for Amtrak. He has severe and recurring sciatica. He has a recurring dragging foot. Those conditions weaken him and significantly affect his balance, leading to several falls. They are disqualifying for being a Conductor or returning to his previous lifestyle.

28. Mr. Thompson was in extreme pain from the incident. Mostly, he slept and rested. For all intents and purposes, Mr. Thompson was bed/couch-ridden until after his first surgery.

29. At first, Mr. Thompson's doctors limited him to lifting no more than ten pounds. Sometime after his first surgery, Mr. Thompson's doctors told him that he could lift no more than twenty pounds. Even though Mr. Thompson followed his doctors' orders as precisely as possible, the pain and discomfort continued. In fact, after a while, Mr. Thompson's pain and discomfort exponentially increased. After seeing multiple doctors, he was finally diagnosed as needing another hernia surgery. Mr. Thompson had his second hernia surgery on July 28, 2021.

30. Throughout this entire time, up through today, Mr. Thompson's doctors have ordered him to be careful in his movements and do nothing athletic. In fact, Mr. Thompson uses great care when merely walking, given he has fallen multiple times due to his dragging foot.

31. Mr. Thompson's condition is improving now. Nonetheless, his Primary Care Physician, Dr. Garrett Eckerling, is clear that Mr. Thompson is still not to lift anything more than twenty pounds. Mr. Thompson cannot return to his previous active, do-it-yourself lifestyle.

32. Due to the incident, Mr. Thompson could never return to his job as a Passenger Conductor. Dr. Eckerling has confirmed that Mr. Thompson cannot perform the essential functions of the job. Being a Passenger Conductor is too strenuous and dangerous for Mr. Thompson. For

instance, a Conductor routinely and repeatedly must be able to place on and remove bags from the train that weigh up to fifty pounds. In addition, a Conductor frequently must place on and remove from the train bags and freight (Amtrak Express) that weigh up to eighty pounds and more. Mr. Thompson simply cannot do those essential functions due to the incident.

33. Mr. Thompson's stress from not only his injury and its direct effects on his body, but from the circus of medical care, lack of income, his inability to complete necessary and even simple tasks around his home have been extreme. Mr. Thompson is wildly stressed because he cannot do the work to keep his property fire safe. Even Mr. Thompson's neighbors have complained about his inability to maintain his property at their road. Mr. Thompson has gone from a highly functioning, happy person to one who has difficulty functioning at all.

34. Utterly unlike his pre-injury self, Mr. Thompson is overwhelmed by anxiety. His stress and anxiety is affecting his ability to deal with any and all aspects of daily life.

35. Mr. Thompson used to meet day-to-day obligations with ease. Beyond that, he took pride in his ability to problem solve and overcome even very difficult obstacles. He actually enjoyed the challenges.

36. None of that holds true since Mr. Thompson's injury. His attitude has been on a steep downward slide since then. Now the most basic and simple daily obligation or activity is a losing, uphill battle for him.

37. Pre-injury Mr. Thompson was slow to anger. He was empathetic and flexible in his thinking. Now, he is easily angry, contemptuous and irritable. He has very limited emotional energy for anything but experiencing his physical pain and the emotional loss of the life he built over decades.

38. Mr. Thompson is not at all himself since the injury.

/ / /

- 7 -

COMPLAINT

## IV.

## **PARTIES**

39. At all times relevant herein, Mr. Thompson has been a resident of Nevada County, California. Mr. Thompson began his employment as a Passenger Conductor with Defendant Amtrak on July 3, 1990. Since he could not work and earn a living wage after the incident, Mr. Thompson resigned his seniority effective July 31, 2022 to obtain a Railroad Retirement Board Reduced Age and Service annuity. At the time and date of his injury, Mr. Thompson was working as a Passenger Conductor for Defendant Amtrak.

40. At all times relevant herein, Defendant Amtrak provides intercity rail transportation services and is a common carrier within the meaning of the Federal Employer's Liability Act.[2]

41. The true names and capacities of Defendants named herein as Does 1 through 10, inclusive, whether individual, corporate, associate or otherwise are unknown to Mr. Thompson who therefore sue the Defendants by fictitious names. Mr. Thompson will amend this Complaint to show such true names and capacities of Does 1 through 10, inclusive, when they have been determined.

42. Mr. Thompson is informed and believes that each fictitiously-named DOE defendant is legally responsible in some manner for the occurrences alleged and that Mr. Thompson's injuries and damages as alleged were and continue to be legally caused by these defendants' actions.

43. Each defendant was, and continues to be, the agent, servant and employee of each remaining defendant, and was acting within the scope of their agency or employment, with the knowledge and consent of their principal or employer.

44. Mr. Thompson is informed and believes that defendants, including DOES 1 through 10, inclusive, were corporations, business entities, public agencies, utilities, associations, partnerships, joint venturers and/or individuals who conducted business in the State of California.

---

[2] 45 U.S. Code § 51, *et seq.*

## V.

## JURISDICTION AND VENUE

45. At all times relevant herein, Defendant Amtrak has provided its rail transportation services throughout the state of California. Defendant Amtrak was doing business in this District on January 20, 2020 and at the time of the filing of this action, by, among other things, having significant management and infrastructure in the District along with providing its rail transportation services.

46. This action arises out of a federal question, Federal Employers' Liability Act, 45 U.S.C. § 51, et seq..

## FIRST CAUSE OF ACTION

### Federal Employers' Liability Act (FELA)

### Negligence

### 45 U.S.C. § 51, *et seq.*

### (Against All Defendants)

47. Mr. Thompson hereby incorporates by reference Paragraphs 1 through 46 of this Complaint as if fully set forth herein and for a cause of action allege as follows:

48. Defendant Amtrak is a common carrier, within the meaning of the Federal Employer's Liability Act (hereinafter, "FELA")[3]. As such, Defendant Amtrak is liable to Mr. Thompson for damages he suffered caused by Defendant Amtrak's negligence.

49. Under FELA, the case should go to a jury if "employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."[4] "This standard is highly favorable to the plaintiff, and recognizes that the FELA is protective of the plaintiff's right to

---

[3] *Fontaine v. National R.R. Passenger Corp.*, 54 Cal.App.4th 1519 (Cal. Ct. App. 1997).

[4] *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011).

a jury trial."[5]

50. Defendant Amtrak's negligence is clear. At all times relevant here, Defendant Amtrak knew that its couplers needed to be properly maintained so that they could easily be moved by train service employees; i.e., Passenger Conductors and Assistant Conductors. Mr. Thompson is informed and believes, and thereon alleges, that Defendant Amtrak knew that an improperly maintained coupler could be difficult or impossible to move by a train service employee and could injure that person.

51. At the time of his injury, Mr. Thompson knew from his decades of experience that if a coupler is properly maintained, it moves easily. In other words, coupling mechanisms work unless they are improperly maintained in some way. Given that the coupler at first would not move and then suddenly and unexpectedly jammed when it did move - injuring Mr. Thompson in the process - Defendant Amtrak had improperly maintained the coupler. By placing and/or keeping the coupler in service while it was improperly working, Defendant Amtrak committed negligence.

52. Moreover, Defendant Amtrak committed negligence by not providing an Assistant Conductor for the trip, in violation of the CBA and its own safety rules. When Mr. Thompson could not move the coupler on his first attempt, he should have had an Assistant Conductor to help. Given that Mr. Thompson moved the coupler on his second attempt, an Assistant Conductor helping would have avoided Mr. Thompson's injury.

53. As a direct, foreseeable and proximate result of Defendants' negligence, Mr. Thompson has suffered and continues to suffer substantial economic losses in an amount to be proven at trial.

54. As a further direct, foreseeable and proximate result of Defendants' negligence, Mr. Thompson has suffered emotional distress, and other non-economic damages, to his damage in an amount to be proven at trial.

---

[5] *Wooden v. Mo. Pac. R.R. Co.*, 862 F.2d 560, 561 (5th Cir. 1989).

55. Mr. Thompson has incurred and continues to incur other costs and expenses. Mr. Thompson is presently unaware of the precise amount of these expenses and fees and will seek leave of this court to amend this complaint when the amounts are more fully known.

### SECOND CAUSE OF ACTION
### Federal Employers' Liability Act (FELA)
### Strict Liability Pursuant to the Federal Safety Appliance Act
### 45 U.S.C. § 51, *et seq.*, 49 U.S.C. § 20302, *et seq.*
### (Against All Defendants)

56. Mr. Thompson hereby incorporates by reference Paragraphs 1 through 46 and Paragraphs 48 through 55 of this Complaint as if fully set forth herein and for a cause of action allege as follows:

57. Under FELA, an injured railroad employee may bring a cause of action without proof of negligence based on the failure of safety appliances mandated by the Federal Safety Appliance Act (hereinafter, "FSAA").[6] The FSAA applies to couplers.[7]

58. The FSAA imposes strict liability on railroad carriers for their violations of safety standards.[8]

59. "Proof of an actual break or physical defect . . . is not a prerequisite to finding that the statute has been violated."[9] Mr. Thompson need only present evidence "that the mechanism failed to work efficiently and properly even though it worked efficiently and properly before and after the occasion in question."

60. "The test in fact is the performance of the appliance."[10]

---

[6] *Myers v. Reading Co.*, 331 U.S. 477 (1947)
[7] 49 U.S.C. § 20302.
[8] *Crane v. Cedar Rapids & Iowa City Ry. Co.*, 395 U.S. 164, 166 (1969).
[9] *Myers v. Reading Co.*, *supra*, at 483.
[10] *Id.*

61. Here, the coupler failed to work properly. Since the coupler injured Mr. Thompson when he tried to move it, Defendant Amtrak is strictly liable for Mr. Thompson's injuries.

62. As a direct, foreseeable and proximate result of Defendants' actions, Mr. Thompson has suffered and continues to suffer substantial economic losses in an amount to be proven at trial.

63. As a further direct, foreseeable and proximate result of Defendants' negligence, Mr. Thompson has suffered emotional distress, and other non-economic damages, to his damage in an amount to be proven at trial.

64. Mr. Thompson has incurred and continues to incur other costs and expenses. Mr. Thompson is presently unaware of the precise amount of these expenses and fees and will seek leave of this court to amend this complaint when the amounts are more fully known.

**PRAYER FOR RELIEF**

Wherefore, Mr. Thompson requests relief as follows:

**For All Causes of Action**

1. For special and general damages according to proof, however, no less than the jurisdictional limit of this court;
2. For all actual, consequential, and incidental losses and damages, according to proof;
3. For interest as provided by law;
4. For costs of suit incurred herein; and,
5. For such other and further relief as the Court may deem equitable and appropriate.

///

**Demand for Jury Trial**

Mr. Thompson hereby requests a jury trial on all claims so triable.

DATED:   January 11, 2023          FRANK BLOKSBERG

BY:   _____/s/_____
   Frank Bloksberg
   Attorney for Plaintiff Kevin Thompson